## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**SANDRA M. MOORE,**
***administrator of the Estate of***
***James A. White,***

                                :

        **Plaintiff,**

                                 **Case No. 2:21-cv-4134**
                                 **Judge Sarah D. Morrison**
**v.**                             **Magistrate Judge Kimberly A.**
                               **Jolson**

**SHERIFF TEDD E. FRAZIER,** *et*   :
*al.,*

        **Defendants.**

### OPINION AND ORDER

James White was arrested and detained at the Jackson County Correctional Facility (the "Jail") on charges relating to a probation violation and two misdemeanor drug offenses. During his initial medical screening at the Jail, Mr. White reported "stomach problems" with an ulcer and prior treatment for a hernia, but he did not report or provide any medications and did not appear to be suffering from a serious medical condition or illness.

A few days later, Mr. White complained of stomach pain. Corrections officers placed him under medical observation, logging his activity overnight and contacting the Jail's nurse for guidance. Unfortunately, Mr. White's condition continued to decline, and corrections officers found him unresponsive in his cell the next morning. He was transported to the hospital and pronounced dead shortly

thereafter. His autopsy report later revealed that he died of a severe abdominal infection caused by ischemic colitis.

In the months following Mr. White's death, Jail officials learned that he had complained of stomach pain to family members prior to his arrest. He had been eating only cereal and milk because his stomach could not tolerate anything else and had an active prescription for stomach medication but had otherwise refused to go to the doctor. His mother, Sandra Moore, described him as "stubborn" when it came to seeking medical treatment.

Ms. Moore brought this action on behalf of her son's estate against Jackson County Sheriff Tedd Frazier, several corrections officers, and the Jail's contractual healthcare provider and two of its employees. She primarily claims that these Defendants violated her son's constitutional rights when they were deliberately indifferent to his serious medical condition. Sheriff Frazier and the corrections officers (collectively, the "Jackson County Defendants") now seek summary judgment on all claims against them. (Mot., ECF No. 105.) The Motion is fully briefed, and this matter is now ripe for consideration.

## I. STATEMENT OF FACTS

Because the deliberate indifference inquiry is individualized, and because a § 1983 plaintiff must prove each individual defendant's involvement in the alleged violation, the Court focuses on the actions of each Jackson County Defendant in reviewing the facts of this case. *See Greene v. Crawford Cnty., Michigan*, 22 F.4th

2

593, 607 (6th Cir. 2022); *Pineda v. Hamilton Cnty., Ohio*, 977 F.3d 483, 491 (6th Cir. 2020).

### A.    Mr. White's Arrest and Jail Intake

Mr. White was arrested on October 4, 2019. (ECF No. 105-2, PAGEID # 675, 678–81.) He was detained at the Jail, which was overseen by Sheriff Frazier and the Jackson County Sheriff's Office. (ECF No. 93 ("Sheriff Frazier Dep."), 15:14–16:25.) The Sheriff's Office contracted with Premier Health Care Services[1] to serve as the Jail's designated health authority responsible for administrating physical and mental healthcare services to inmates. (ECF No. 105-1; ECF No. 105-10, PAGEID # 757.) Premier Health was required to provide ten hours a week of in-person medical assistance at the Jail and 24/7 on-call services. (ECF No. 105-1, PAGEID # 663–64; ECF No. 97 ("Remines Dep."), 17:13-17, 21:9-13.)

As part of the booking process, Mr. White completed intake forms and received a medical screening. (ECF No. 105-2, PAGEID # 683, 690–93.) Relevant here, he reported stomach problems (an ulcer) and that he had previously suffered from a hernia below his stomach. (*Id.*, PAGEID # 690.) He also reported that he was not taking any medications at the time of his arrest.[2] (*Id.*, PAGEID # 693.) Corrections Officer Chandler Jenkins signed Mr. White's completed booking forms

---

[1] Premier Health is now known as Jail Healthcare Services, Inc. (ECF No. 31, PAGEID # 104.)

[2] According to Ms. Moore, her son had been prescribed four medications in October 2019, including omeprazole for "stomach problems." (ECF No. 94 ("Moore Dep."), 32:16–34:12; ECF No. 111, PAGEID # 835.)

and indicated that Mr. White did not "appear to be in need of Emergency Medical/Mental Treatment." (*Id.*, PAGEID # 683.)

### B. Mr. White's Condition and Medical Observation at the Jail

Mr. White was initially housed in the general population and placed in a cell with James Simpson. (ECF No. 105-2, PAGEID # 686; ECF No. 103 ("Bowling Dep."), 30:9-15; ECF No. 102 ("Simpson Dep."), 9:24–10:17.) Mr. Simpson testified that while they were cellmates, Mr. White complained about worsening stomach aches and cramps. (Simpson Dep., 14:6–16:12, 22:14–23:2, 25:9-19, 45:16–46:1.) Mr. White "was always throwing up" and could not hold food down, vomiting between four and five times a day. (*Id.*, 15:3-12, 17:6-19.) Mr. Simpson also witnessed Mr. White shaking in bed, having difficulty sleeping, and sweating profusely, among other external signs of physical pain. (*Id.*, 16:13-23, 18:20–19:14, 26:8-18.) Both Mr. Simpson and Mr. White notified at least one corrections officer that there was "something seriously wrong" with Mr. White and that he needed to go to the hospital, but they were either ignored or told to "[s]it back in your bed and shut up." (*Id.*, 16:4-12, 19:15-21, 25:23–26:5.) Mr. Simpson could not remember the name(s) of the specific corrections officer(s) who disregarded their requests for help, nor could he identify any of the Jackson County Defendants when their names were read to him. (*Id.*, 19:22–20:2 ("It was some of the young ones, some of the new ones that came in, but I don't know their names."), 20:3–21:23 ("Like, I don't remember none of these."), 40:6–41:4 ("Q. So am I hearing you right that these denials for help, this was one male CO that you remember, don't know his name? A. Don't know his

name. Q. And it is none of the names that you've heard so far[?] A. No.").)

On October 8, 2019, at approximately 8:45 PM, Mr. Simpson got the attention of Corrections Officer Leah Bowling and waved her over to the cell. (ECF No. 113, PAGEID # 908–09.) Officer Bowling walked in and saw Mr. White "on the bottom bunk holding his stomach and moaning in pain." (*Id.*) She did not believe Mr. White was in immediate danger but radioed her supervisor, Corporal Peter Cain Wolford, for assistance. (*Id.*; Bowling Dep., 33:8-18, 54:9-17.)

When he arrived, Corporal Wolford saw Mr. White "holding his belly" with both hands "in pain." (ECF No. 98 ("Wolford Dep."), 21:2-23.) Mr. White told Corporal Wolford and Officer Bowling that his stomach was hurting "real bad," so Corporal Wolford escorted Mr. White to the booking area for medical observation. (*Id.*, 20:13–21:1, 23:5-15; ECF No. 113, PAGEID # 909.) On the way, Corporal Wolford noticed that Mr. White appeared "discomforted" and "groaned a few times as he was walking" at a slower-than-regular pace. (Wolford Dep., 22:3-18.) Corporal Wolford placed Mr. White in Cell 130, which was located near the booking area and was commonly used for medical observation. (*Id.*, 20:13–21:1, 23:5-15.) Two other inmates (Rick Jewell and Larry Young) were already in Cell 130 when Corporal Wolford placed Mr. White there. (ECF No. 121 ("Jewell Aff."), ¶ 4.)

Corporal Wolford told his supervisor, Sergeant Matthew "Duke" Rouse, about Mr. White's complaints. (Wolford Dep., 26:10-25.) In response to Sergeant Rouse's question of whether he had dealt with stomach issues in the past, Mr. White referenced his history of ulcers but denied taking medication for ulcers at that time.

(ECF No. 105-22 ("Rouse Aff."), ¶¶ 4–5.) Sergeant Rouse then texted Brittany

Remines, the on-duty Premier Health nurse, writing:

| | |
|---|---|
| **Rouse**: | … James white says stomach killing him where he's had ulcers. Nothing I can do right |
| **Remines**: | Does he take meds? |
| **Rouse**: | Not that I know of |
| **Remines**: | Then he's prob full of shit |
| **Rouse**: | Ok. So don't worry about it then. I've got him in 130 on 30 minute watch |
| **Remines**: | Yea tell him I'll see him tomorrow |
| **Rouse**: | Ok thanks |
| **Remines**: | Welcome |

(Remines Dep., 37:2-15; ECF No. 105-4, PAGEID # 702.)

Nurse Remines followed up the text exchange with a phone call, during which

Sergeant Rouse confirmed that Mr. White had said in a "calm voice" that he was

having stomach pain. (Remines Dep., 41:2–42:18.) Nurse Remines told Sergeant

Rouse that she would check on Mr. White during her shift the next day (October 9)

and advised Sergeant Rouse to keep Mr. White on a 30-minute observation schedule

inside Cell 130 in the meantime and to alert her if his symptoms worsened. (*Id.*;

ECF No. 105-9, PAGEID # 745.)

The parties diverge on their accounts of Mr. White's behavior in Cell 130. Mr.

Jewell testified that Mr. White "was in noticeable pain" and was "moaning and

groaning loudly, holding his abdomen with both arms." (Jewell Aff., ¶ 6.) Mr. Jewell

further stated that:

During the entire time that [Mr. White] was in the cell with us, he
was in excruciating pain. The pain was so bad that he could not stay
in one location for long. He would sometimes sit on the bench or the
floor for a minute or two, rocking back and forth moaning loudly, and
then he would pace back and forth in the small cell, oftentimes

6

> hunched forward clutching his stomach. I never saw him sleep. For
> most of the time he was in the cell, he was wailing in pain, sometimes
> even begging for God to intervene and save him. His wails became so
> loud that I had to tear-off pieces of toilet paper and shove them into
> my ear canals to get some sleep, but I could still hear him.

(*Id.*, ¶¶ 7–8.) Mr. Jewell also testified that Mr. White continuously "ask[ed] the

corrections officers who walked by the cell door for immediate medical attention and

to transport him to the hospital," but the officers "refused to transport him,

claiming that he was just faking his symptoms to get out of jail," and instructed him

"to be quiet as he was disturbing other inmates." (*Id.*, ¶¶ 6, 8.)

Contrary to Mr. Jewell's account, the Jackson County Defendants maintain

that Jail officials monitored Mr. White overnight and into the morning of October 9

without incident, logging their observations in an Observation Cell Record.[3] (ECF

No. 105-2, PAGEID # 685.) Observing officers included Sergeant Rouse and

Corrections Officers Bowling, Jenkins, Brittany Angel, Cameron Davis, Brodie

Bailey, and Blaise Cook. (*Id.*; Angel Dep., 20:2–21:16; ECF No. 105-21 ("Sprague

Aff.), ¶ 7.) The Observation Cell Record reflects that at various times, the observing

officers saw Mr. White sitting up, standing, holding his stomach, talking or

moaning,[4] sleeping, or resting. (ECF No. 105-2, PAGEID # 685.) The entries on the

---

[3] The Jail's policy with respect to inmate observation requires that officers
"look in and check on [the inmate]" and "make sure [they] see some kind of
movement," though officers could choose to "go in and talk to [the inmate]" or "talk
through the door." (ECF No. 96 ("Angel Dep."), 13:23–14:18; *see also* ECF No. 95
("Mapes Dep."), 29:16–30:20 ("I would look in just to make sure everything appears
okay … If they're awake and they look at me or something, I'll ask them.").)

[4] Officer Angel testified that although she described Mr. White as "talking,"
the more accurate description was "moaning in pain." (Angel Dep., 23:1-13.) The
evidence does not indicate whether other corrections officers who also used the word

Observation Cell Record show that Mr. White was observed every 15–30 minutes, except there were no entries made between 6:08 AM and 7:35 AM. (*Id.*)

No officer entered Cell 130 or spoke with Mr. White overnight until around 6:33 AM on October 9, when Mr. White told Officer Jenkins that "an area above his groin was hurting and his back was hurting." (ECF No. 99 ("Jenkins Dep."), 22:19–23:12; ECF No. 105-12, PAGEID # 770; Jewell Aff., ¶ 9.) Mr. Young also told Officer Jenkins that Mr. White was having trouble urinating. (Jenkins Dep., 26:15-22; ECF No. 105-12, PAGEID # 770.) But Officer Jenkins did not see anything indicating that Mr. White "was having a medical emergency right then and there," and Mr. White did not ask to be transported to the hospital at that time. (Jenkins Dep., 24:16–25:5.) Nevertheless, Officer Jenkins called Nurse Remines and notified her of Mr. White's symptoms.[5] (ECF No. 105-12, PAGEID # 770; ECF No. 105-11, PAGEID # 767 ("I was then contacted at approx. 06:30 hours by the third shift supervisor Chandler Jenkins (Unit 324), that James White was complaining of stomach pain as well as flank pain. James White was not vomiting or showing signs of distress.").) In response, Nurse Remines (who suspected Mr. White was suffering from kidney stones) instructed that Mr. White increase his fluid intake and advised Officer Jenkins that she would check on Mr. White later that day and to notify her if Mr.

---

"talking" meant it to convey moaning.

[5] Officer Jenkins testified that he told Nurse Remines about Mr. White's trouble urinating, but that symptom does not appear in Nurse Remines's written notes, and she testified that she does not recall whether Officer Jenkins did in fact relay that symptom to her. (Jenkins Dep., 35:11–36:7; Remines Dep., 78:12–79:15.)

White's condition worsened.[6] (ECF No. 105-11, PAGEID # 767; Jenkins Dep., 37:15–24; ECF No. 105-7, PAGEID # 715.) Officer Jenkins gave Mr. White some water but did not ensure that he drank it. (ECF No. 105-12, PAGEID # 770; Jewell Aff., ¶ 9.)

### C.    Mr. White's Medical Emergency and Death

Officer Angel observed Mr. White over the next few hours. (ECF No. 105-2, PAGEID # 685.) During that time, she saw Mr. White sitting and resting in the cell, but he would "jump up and stand in the doorway" upon seeing her in the booking area, so "it didn't seem like he was in much pain." (Angel Dep., 15:14–16:16.) When Officer Angel asked Mr. White where he was hurting, he "kind of groaned and pointed" and "motioned to his stomach, but he would never tell [Officer Angel] what was wrong." (*Id.*, 14:19–16:1, 34:4–37:2; ECF No. 105-3, PAGEID # 701.) Officer Angel did not find Mr. White's behavior unusual but rather likened it to that of individuals going through drug or alcohol withdrawal. (Angel Dep., 16:21–17:2.) She advised Mr. White that the nurse would be in to see him later that day and reported the interaction to her supervisor, Sergeant Alden Mapes. (ECF No. 105-3, PAGEID # 701.) Separately, Major Floyd Yates (a Jail Administrator) noticed Mr. White that morning "standing up, lucid, walking

---

[6] Nurse Remines testified that she verbally instructed Officer Rouse and possibly Officer Jenkins to arrange for Mr. White's transportation to the hospital if his symptoms worsened or if the situation "became emergent," though she did not specify what she meant by "emergent." (Remines Dep., 62:19–63:2, 70:20–72:13, 121:2–124:21.) The Jackson County Defendants deny that Nurse Remines gave any orders "to send [Mr. White] out to the hospital." (Mot., PAGEID # 650.) A narrative written by Nurse Remines after her call with Officer Jenkins indicates that she did not give any orders to send Mr. White to the hospital, and her treatment notes also lack any reference to hospital transport. (ECF No. 105-7, PAGEID # 713, 715.)

around," and not "display[ing] any signs of distress." (ECF No. 105-19 ("Yates Aff."), ¶ 4.)

At approximately 10:50 AM on October 9, Mr. Jewell motioned Officer Angel over to the cell. (Angel Dep., 24:8-14; ECF No. 115-4, PAGEID # 963.) Officer Angel opened the cell door and saw Mr. White laying on the floor looking pale. (Angel Dep., 24:15-17, 25:13-20.) She approached Mr. White, repeating his name and tapping him on the shoulder, but when he did not respond and she could not discern whether he was breathing, she began preliminary CPR procedures and radioed for assistance. (*Id.*, 25:3–26:10.)

Sergeant Mapes arrived at Cell 130 at approximately 10:52 AM and observed Mr. White on the ground. (ECF No. 105-13, PAGEID # 772; Angel Dep. 38:3-21; Mapes Dep., 37:15-25.) Unable to find a pulse, Sergeant Mapes began chest compressions and directed Officer Angel to call for help, which she did. (Mapes Dep., 38:4-18; Angel Dep., 26:11-25.) Sergeant Mapes and other officers performed CPR on Mr. White until the EMS squad arrived at approximately 10:56 AM. (ECF No. 105-9, PAGEID # 747.) Sheriff Tedd Frazier waited at the Jail entrance for EMS, and Major Tabetha Sprague ordered Officer Angel to remove Mr. Jewell from the cell and monitored the EMS arrival time. (ECF No. 105-13, PAGEID # 774.)

The EMS squad transported Mr. White to Holzer Medical Center at 11:00 AM, where he was pronounced dead. (ECF No. 105-3, PAGEID # 701; ECF No. 105-6, PAGEID # 707; ECF No. 105-9, PAGEID # 747.) Mr. White's autopsy report

revealed that he died of peritonitis due to an ischemic distal colon, and there was approximately 1,200 mL of "brown liquid" in his abdominal cavity. (ECF No. 105-8, PAGEID # 734.) There was also methamphetamine in his system. (*Id.*, PAGEID # 739.) Doctor Alice Frazier (Jackson County Coroner and Jail Medical Director) learned of Mr. White's death later that day and informed the Jail and Ms. Moore of her son's passing. (ECF No. 100 ("Alice Frazier Dep."), 11:1-12, 36:10-13; Moore Dep., 69:11-18; ECF No. 105-13, PAGEID # 775.)

The next day (October 10), Ms. Moore came to the Jail to collect Mr. White's belongings. (ECF No. 105-13, PAGEID # 775; Moore Dep., 71:4-17.) She signed for and received Mr. White's wallet, phone, and other items but did not receive any medications. (ECF No. 105-13, PAGEID # 775; Moore Dep., 100:9-11; ECF No. 105-2, PAGEID # 700.) Ms. Moore told Jail personnel that her son had complained of stomach "troubles" before he was arrested. (ECF No. 105-13, PAGEID # 775.) Later, on February 3, 2020, Ms. Moore met with Sheriff Frazier, Major Yates, Major Sprague, and Chief Deputy Scott Conley and "admitted that prior to incarceration, her son had complained of stomach pain and was only able to eat cereal and drink milk." (ECF No. 105-6, PAGEID # 707; Moore Dep., 75:17–80:4, 105:10-19.) She also told the officials that he disliked visiting doctors, noting in her deposition that he could be "stubborn" with respect to seeking medical care. (ECF No. 105-6, PAGEID # 707; Moore Dep., 68:2-4.)

## D.    Jail Policies and Subsequent Investigation

Following Mr. White's death, Sheriff Frazier ordered an administrative

investigation into the cause of Mr. White's medical emergency. (Sheriff Frazier Dep., 34:8-15, 37:21–38:23.) Sheriff Frazier directed all officers who interacted with Mr. White to draft narrative reports. (*Id.*, 34:11-15.) Officers searched and inventoried Cell 130 but found no evidence of contraband or other potentially dangerous substances. (ECF No. 105-13, PAGEID # 774; ECF No. 105-6, PAGEID # 705–06; Sprague Aff., ¶ 9.)

As part of this investigation, Sheriff Frazier also sought to establish the extent to which Jail policies were followed. (Sheriff Frazier Dep., 34:8-15, 37:21–38:23.) Pursuant to Jail policy at the time, "[n]o inmate shall be denied necessary health care, as designated by the health authority [Premier Health]," and "[w]hen necessary medical, mental health or dental care is not available at the jail, inmates are [to be] referred to an appropriate off-site health care setting." (ECF No. 105-10, PAGEID # 755–57.) Corrections officers were to "support[] the implementation of clinical decisions that are made by authorized health care professionals." (*Id.*, PAGEID # 760.) Although the record does not include any Jail policies that outline specific procedures for medical emergencies, Jail officials testified that they (or their supervisors) were directed to contact the on-duty nurse in the event of any medical concerns relating to inmates. (Sheriff Frazier Dep., 77:18-24; Angel Dep., 44:8–45:18; Bowling Dep., 54:24–55:10.) For emergency situations, Jail officials were instructed to contact Jackson County EMS for the inmate's transport to Holzer Medical Center without awaiting any communications with or direction from the on-duty nurse. (Sheriff Frazier Dep., 101:16–102:1; Remines Dep., 123:8-16.)

12

The administrative investigation found that Jail officials acted properly and did not violate any policies, in part because Sheriff Frazier determined that none of the officers identified a medical emergency for Mr. White prior to finding him unresponsive. (Sprague Aff., ¶ 5; Yates Aff., ¶¶ 5–6; Sheriff Frazier Dep., 135:19-25.) The Jail subsequently submitted its investigation findings to the Jackson County Prosecutor's Office and the Ohio Department of Rehabilitation and Correction ("ODRC"). (Sheriff Frazier Dep., 34:11-15.) ODRC identified two standards related to the provision of inmate medical care with which the Jail was not in compliance; both the Jail and Premier Health instituted corrective plans of action in response, including increasing the number of hours that nurses are required to be physically present at the Jail, instituting training sessions on medical emergencies, and instructing officers to send inmates to the hospital if unable to reach Doctor Frazier or if otherwise in doubt, among others. (Sheriff Frazier Dep., 117:12-20; Alice Frazier Dep., 47:1–49:6; Sprague Aff., ¶¶ 11–12.)

## II.    PROCEDURAL BACKGROUND

Ms. Moore commenced this action on August 10, 2021, against Sheriff Frazier, Deputy Conley, Sergeant Mapes, Officer Angel, and several unidentified "John Doe" Defendants. (ECF No. 1.) After learning the identities of the Doe Defendants, Ms. Moore amended her Complaint to name 11 additional Jail officials, Nurse Remines, Ms. Newport (Nurse Remines's coworker), and Premier Health. (Am. Compl., PAGEID # 70–72.)

The Jackson County Defendants now move for summary judgment on all claims against them:

13

- An Eighth Amendment claim under 42 U.S.C. § 1983 against all Jackson County Defendants (excluding Sheriff Frazier) for failure to provide medical care (Count I);
- A claim for failure to train or supervise under 42 U.S.C. § 1983 against Sheriff Frazier only (Count II);
- A wrongful death claim against all Jackson County Defendants (Count IV); and
- A survival claim against all Jackson County Defendants (Count VI).

(Am. Compl. ¶¶ 14–33.)

At the outset, Ms. Moore has "conced[ed] that the evidence does not support individual claims against Conley, Yates, Sprague, McGhee, Allen and Mapes."[7] (Resp., PAGEID # 1104.) Accordingly, the Court **GRANTS** summary judgment in these Defendants' favor on all claims against them and evaluates the allegations against the remaining Jail officials below. *See, e.g.*, *Young v. Olympus Am., Inc.*, No. 07-2547-STA, 2010 WL 1856539, at *4 (W.D. Tenn. May 6, 2010) (granting summary judgment as to claims conceded by plaintiffs).

## III.   STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving

---

[7] Ms. Moore includes Deputy Allen in this concession but later maintains that Deputy Allen acted with deliberate indifference such that summary judgment should be denied. (*Compare* Resp., PAGEID # 1104, *with id.*, PAGEID # 1106.) However, even viewing the evidence in the light most favorable to Ms. Moore, Deputy Allen had no interaction or involvement with Mr. White beyond serving as the officer who inventoried the medical cell following his death. (Sprague Aff., ¶¶ 8–9.) Summary judgment is therefore warranted.

party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. *See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the nonmoving party).

## IV.   ANALYSIS

### A.   Deliberate Indifference Claim Against Sergeant Rouse, Corporal Wolford, and Officers Angel, Bowling, Jenkins, Cook, Bailey, and Davis (Count I)

With respect to the remaining Jail officials (excluding Sheriff Frazier), Ms. Moore contends that each was deliberately indifferent to a serious risk of harm to her son while he was detained, in violation of his Eighth Amendment rights. (Resp.,

PAGEID # 1093.) The Jackson County Defendants respond that Ms. Moore has not met her burden to show deliberate indifference and cannot overcome their defense of qualified immunity. Because Ms. Moore has failed to demonstrate that these officials' conduct rose to the level of deliberate indifference, she cannot prove a constitutional violation.

Both convicted prisoners and pretrial detainees have "a constitutional right to be free from deliberate indifference to their serious medical needs." *Howell v. NaphCare, Inc.*, 67 F.4th 302, 310 (6th Cir. 2023). For prisoners, this right arises under the Eighth Amendment, which prohibits "cruel and unusual punishments[.]" *Greene*, 22 F.4th at 605 (citing U.S. Const. amend. VIII). For pretrial detainees, this right is protected by the Due Process Clause of the Fourteenth Amendment. *Griffith v. Franklin Cnty., Kentucky*, 975 F.3d 554, 566 (6th Cir. 2020).

For many years, this was a distinction without a difference—courts in this circuit analyzed both pretrial detainees' and prisoners' claims of deliberate indifference "under the same rubric," requiring plaintiffs to establish one objective and one subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Brawner v. Scott Cnty.*, 14 F.4th 585, 591 (6th Cir. 2021) (citation omitted). To satisfy the objective component, the plaintiff needed to show that the prisoner or detainee had an "objectively" serious medical need. *Farmer*, 511 U.S. at 834; *see also Griffith*, 975 F.3d at 567 (finding that objective component "require[d] a plaintiff to prove that the alleged deprivation of medical care was serious enough to violate the Constitution"). To meet the subjective component, the plaintiff had to demonstrate

that "an official kn[ew] of and disregard[ed] an excessive risk to inmate health or safety; the official must both [have been] aware of facts from which the inference could be drawn that a substantial risk of harm exist[ed], and he must also [have] draw[n] the inference." *Farmer*, 511 U.S. at 837.

However, in 2015, the Supreme Court considered a similar framework in the context of excessive force claims in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015). There, the Court concluded that a pretrial detainee need demonstrate "only that the force purposely or knowingly used against him was objectively unreasonable," whereas prisoners must prove both subjective and objective unreasonableness. *Id.* at 396–97, 400–02. The *Kingsley* opinion did not explicitly address whether an objective-only standard applies to other pretrial-detainee claims, such as deliberate indifference, but the Sixth Circuit subsequently determined that *Kinglsey* did modify the subjective prong of the deliberate-indifference test for pretrial detainees. *Brawner*, 14 F.4th at 596 ("Given *Kingsley*'s clear delineation between claims brought by convicted prisoners under the Eighth Amendment and claims brought by pretrial detainees under the Fourteenth Amendment, applying the same analysis to these constitutionally distinct groups is no longer tenable."). As a result, "[a] pretrial detainee must prove more than negligence but less than subjective intent— something akin to reckless disregard." *Id.* (internal quotation marks omitted); *Helphenstine v. Lewis Cnty., Kentucky*, 60 F.4th 305, 316 (6th Cir. 2023), *cert. denied*, 144 S. Ct. 692 (2024) ("Simply put, *Brawner* held that *Kingsley* required us to lower the subjective component from actual knowledge to recklessness."). In other

words, a plaintiff must prove that a defendant "acted deliberately (not accidentally), [and] also recklessly 'in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Id.* (quoting *Farmer*, 511 U.S. at 836).

Putting everything together, a plaintiff prevails on a deliberate indifference claim if they show that (1) the pretrial detainee had an "objectively serious" medical need; and (2) each defendant deliberately and also recklessly acted or failed to act "where a reasonable official in their position would have recognized that [the detainee's] serious medical need posed an unjustifiably high risk of harm."[8] *Howell*, 67 F.4th at 312 (internal quotations and citations omitted).

### a)    Objectively Serious Medical Need

"A sufficiently serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Yarbrough v. Henderson Cnty., Tennessee*, No. 23-5117, 2024 WL 229665, at *4 (6th Cir. Jan. 22, 2024) (quoting *Griffith*, 975 F.3d at 567 (internal quotation marks omitted)). External signs of internal distress can indicate to a layperson that a detainee has a

---

[8] In 2022, a panel of the Sixth Circuit interpreted *Brawner* as adding a third prong: that "the prison official knew that his failure to respond would pose a serious risk to the pretrial detainee and ignored that risk." *Trozzi v. Lake County*, 29 F.4th 745, 757–58 (6th Cir. 2022). The parties urge the Court to apply this three-part test. (Mot., PAGEID # 647; Resp., PAGEID # 1094.) But later panels have rejected *Trozzi*, finding that its "framing of the elements is irreconcilable with *Brawner*." *See, e.g.*, *Grote v. Kenton Cnty., Kentucky*, 85 F.4th 397, 405 (6th Cir. 2023); *Howell*, 67 F.4th at 311 n.3; *Helphenstine*, 60 F.4th at 316–17.

serious medical need. *See, e.g., Preyor v. City of Ferndale*, 248 F. App'x 636, 642 (6th Cir. 2007) (finding sufficiently serious medical condition where detainee was seen lying on the cell floor and suffered from "severe" stomach pain, vomiting, and diarrhea causing dehydration); *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 899 (6th Cir. 2004) (vomiting is "a clear manifestation of internal physical disorder"). Placing a pretrial detainee in an observation cell due to his medical condition also "tends to show a sufficiently serious medical need." *Helphenstine*, 60 F.4th at 318. Courts have "routinely held that a condition resulting in death is 'sufficiently serious' to meet the objective component." *Burwell v. City of Lansing*, 7 F.4th 456, 463 (6th Cir. 2021) (citing *Winkler v. Madison Cty.*, 893 F.3d 877, 890 (6th Cir. 2018)); *see also Howell,* 67 F.4th at 311–12; *Rouster v. Cty. of Saginaw*, 749 F.3d 437, 446 (6th Cir. 2014); *Speers v. Cty. of Berrien*, 196 F. App'x 390, 394 (6th Cir. 2006); *Larrick v. Tuscarawas Cnty.*, No. 5:21-CV-00959, 2023 WL 6311396, at *21 (N.D. Ohio Sept. 28, 2023).

As discussed, the parties dispute the extent of Mr. White's external symptoms. But the Court need not resolve this disagreement because the evidence is undisputable that he was in medical distress. Mr. White told Corporal Wolford, Officer Jenkins, Officer Bowling, and Sergeant Rouse about his stomach pain and indicated the same to Officer Angel when he pointed to his stomach in front of her. (ECF No. 113, PAGEID # 908–09; Wolford Dep., 20:13–21:1; Jenkins Dep., 22:19–23:12; Rouse Aff., ¶¶ 4–5; Angel Dep., 14:19–16:1.) Corporal Wolford decided to place Mr. White on medical observation, and he admitted that he could tell from Mr.

19

White's appearance and gait that he was in pain while escorting him to the medical cell. (Wolford Dep., 21:2–22:14, 23:5-15.) Although the Jackson County Defendants were not aware of the cause of the medical distress, they knew that Mr. White required extra observation and that he was exhibiting pain that worsened and spread over time.

Moreover, both Ms. Moore's medical expert and Doctor Frazier testified that if left untreated, peritonitis is fatal. (Alice Frazier Dep., 35:24–36:2; ECF No. 119 ("Hookman Dep."), 41:14–42:13); *see Speers*, 196 F. App'x at 394 ("Expert testimony showed that delirium tremens, if untreated, is often fatal—which assuredly makes it a 'serious' medical condition."). That proposition proved true in Mr. White's case, a fact that numerous courts in this circuit have found indicative of "an objectively serious need for medical treatment" in it of itself. *Rouster*, 749 F.3d at 446 (finding that detainee's perforated duodenum—which leaked toxic materials into his abdominal cavity, caused internal bleeding, and led to his death within days of being detained—was "[c]learly" sufficiently serious to meet the objective prong); *see also Burwell*, 7 F.4th at 463 (citing cases).

Mr. White had an objectively serious medical need.

### b)    Subjective Disregard of Serious Medical Need

To prove that the Jail officials deliberately and recklessly acted or failed to act where a reasonable official in their position would have recognized that Mr. White's serious medical need posed an unjustifiably high risk of harm, Ms. Moore must prove "more than negligence but less than subjective intent—something akin

20

to reckless disregard." *Howell*, 67 F.4th at 312 (citing *Brawner*, 14 F.4th at 598). She must make this showing as to each individual official, because § 1983 "imposes liability only on a defendant who was personally involved in the unconstitutional action that caused the plaintiff's injury." *Pineda*, 977 F.3d at 491; *see also Stuckey v. Wilson*, No. 1:08-cv-00184, 2008 WL 11351365, at *3 (S.D. Ohio Aug. 4, 2008) (Beckwith, J.) ("Recovery under Section 1983 is predicated on a plaintiff's ability to identify the officer who allegedly violated the constitutional right."). As such, "[i]n the face of [a] motion for summary judgment, a § 1983 plaintiff must produce evidence supporting each individual defendant's personal involvement in the alleged violation to bring that defendant to trial." *Pineda*, 977 F.3d at 491; *see also Greene*, 22 F.4th at 607 (quoting *Speers*, 196 F. App'x at 394) ("At the second prong, because we cannot 'impute knowledge from one defendant to another[,]' we must 'evaluate each defendant individually[.]'"); *Grote*, 85 F.4th at 408 (emphasis in original) ("Again, the deliberate indifference inquiry is *individualized*; differently situated individual officers may be deliberately indifferent based on what they see, what they should have known, or their actions in response to a detainee's needs.").

On this point, both Mr. Simpson and Mr. Jewell[9] testified about the actions

---

[9] The Jackson County Defendants ask the Court to deem Mr. Jewell's affidavit as a sham affidavit, arguing that it contradicts the narrative he provided as part of the Jail's investigation into Mr. White's death. (Reply, PAGEID # 1118.) "A party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts [his] earlier deposition testimony." *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986) (citation omitted). However, as the Jackson County Defendants acknowledge, Mr. Jewell's prior narrative was not rendered under oath. *See, e.g.*, *Lanier v. Bryant*, 332 F.3d 999, 1004 (6th Cir. 2003) (applying sham affidavit rule only to sworn testimony).

(or inaction) of unnamed or unidentified "corrections officers." (*See, e.g.*, Jewell Aff., ¶ 6 ("The corrections officers refused to transport him … I continued to hear him ask the corrections officers who walked by the cell for immediate medical attention[.]"), ¶ 8 ("At times, some of the corrections officers would stop by the cell door and instruct him to be quiet[.]"), ¶ 11 (describing "the complete and utter disregard for human life displayed by the corrections officers"); Simpson Dep. 19:22–20:2, 20:3–21:23, 40:6–41:4.) However, these types of generalized allegations do not create triable issues as to the conduct of any individual Jackson County Defendant.

The Sixth Circuit addressed this issue in *Jones v. Muskegon Cnty.*, 625 F.3d 935 (6th Cir. 2010). In that case, the father of a detainee who died of colorectal cancer claimed that 21 corrections officers were deliberately indifferent to his son's serious medical needs in violation of his constitutional rights. *Id.* at 942. He supported his claim with affidavits that referred to "guards" generally but did not specify wrongdoing attributable to any particular defendant (i.e., which officers were making comments, which officers ignored requests for medical care, which officers were around the detainee during the relevant period, etc.). *Id.* Because the

---

Moreover, "an affidavit submitted in opposition to a motion for summary judgment should be stricken only if it 'directly contradicts' prior sworn testimony and no 'persuasive justification' is provided for the contradiction." *In re Nat'l Century Fin. Enterprises, Inc.*, 846 F. Supp. 2d 828, 879 (S.D. Ohio 2012) (Graham, J.) (quoting *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006)). Here, Mr. Jewell's affidavit does not contradict his earlier narrative but rather "fills a gap left open" by the narrative. (*Compare* Jewell Aff., *generally*, *with* ECF No. 105-14, PAGEID # 777.)

affidavits did not "implicate any specific officer," the court found that they were insufficient to establish a genuine issue of material fact in the context of a deliberate indifference claim against the corrections officers. *Id.* at 943; *see also, e.g.*, *Murphy v. Grenier*, 406 F. Appx 972, 974 (6th Cir. 2011) (emphasis added) (affirming summary judgment in favor of defendant where plaintiff's "opposing affidavit merely stated that *someone* had opened his mail"). Like the plaintiff in *Jones*, Ms. Moore's reliance on Mr. Simpson's and Mr. Jewell's assertions regarding the conduct of unnamed "corrections officers" does not preclude a grant of summary judgment in favor of the Jackson County Defendants.

With this in mind, the Court reviews the evidence regarding what each named Jail official (Bowling, Wolford, Rouse, Jenkins, Angel, Cook, Bailey, and Davis) saw and did in chronological order.

<u>Officer Bowling.</u> Officer Bowling was the first named corrections officer to respond to Mr. White's complaints of stomach pain. (Resp., PAGEID # 1088.) Officer Bowling saw Mr. White holding his stomach and moaning, and she heard him tell Corporal Wolford that he was having "really bad stomach pains." (ECF No. 105-11, PAGEID # 765.) She also assisted with Mr. White's overnight medical observation, making one entry in the Observation Cell Record that Mr. White was "standing" on October 8 at 10:30 PM. (ECF No. 105-2, PAGEID # 685.) There is no evidence that Officer Bowling was aware of Mr. White's medical history or that he had prior stomach "troubles" and unreported medication. She knew only that he complained

23

of stomach pain.[10] (ECF No. 113, PAGEID # 909.) When confronted with Mr. White's complaints of stomach pain, she contacted her supervisor (Corporal Wolford) per Jail policy. Officer Bowling performed her duties, and there is no evidence that she deliberately and recklessly disregarded Mr. White's medical needs.

Corporal Wolford. After Mr. White told him and Officer Bowling about his "really bad stomach pains," Corporal Wolford placed Mr. White in Cell 130 for medical observation. (Wolford Dep., 22:3–23:15.) When moving Mr. White, Corporal Wolford saw that he was in pain. (*Id*.) Corporal Wolford reported Mr. White's situation to his supervisor, Sergeant Rouse. (*Id*., 26:10-25.) Like Officer Bowling, Corporal Wolford was unaware of Mr. White's medical history and other later-discovered facts. Although he witnessed Mr. White in pain while walking, Mr. White was able to walk unassisted. (*Id*.) By placing Mr. White in Cell 130 for observation and reporting the situation to his supervisor, Corporal Wolford was not recklessly disregarding Mr. White's medical needs.

Sergeant Rouse. After Corporal Wolford brought Mr. White's stomach pains to his attention, Sergeant Rouse spoke to Mr. White, and Mr. White told Sergeant Rouse that his stomach hurt and that he had a history of ulcers. (Rouse Aff., ¶¶ 4–5.) Sergeant Rouse then contacted Nurse Remines. (Remines Dep., 37:2-15.) Nurse

---

[10] Doctor Perry Hookman, Ms. Moore's medical expert, did not render an opinion as to the actions or inactions of *any* of the Jackson County Defendants because he did not "think they [had] any medical experience to—to make or break any diagnosis or know anything about medicine. All they're hearing is somebody has stomach pain." (Hookman Dep., 81:12-23.)

24

Remines told Sergeant Rouse that she would check on Mr. White the next day (October 9) and advised Sergeant Rouse to monitor Mr. White's condition and alert her if his symptoms worsened. (*Id.*; ECF No. 105-9, PAGEID # 744–45.) Sergeant Rouse then conducted observatory checks of Mr. White from 8:45 to 10:11 PM on October 8 and saw him holding his stomach, sitting, walking, and jumping up without difficulty. (ECF No. 105-2, PAGEID # 685; Rouse Aff., ¶ 8.)

Consistent with Jail policy, Sergeant Rouse reached out to Nurse Remines for additional instructions upon hearing of Mr. White's stomach issues. (Remines Dep., 37:2-15; ECF No. 105-1, PAGEID # 668; ECF No. 105-4, PAGEID # 702.) There is no evidence that Sergeant Rouse did not accurately convey what he knew of Mr. White's condition to Nurse Remines. Even assuming that Nurse Remines affirmatively told Sergeant Rouse to send Mr. White to the hospital if his symptoms worsened, there is no evidence that Mr. White's condition worsened while Sergeant Rouse was on duty or that Sergeant Rouse was aware of any worsening symptoms.

Generally, non-medically trained officers do not act with deliberate indifference to a detainee's medical needs when they reasonably defer to a medical professional's diagnosis or treatment. *McGaw v. Sevier County*, 715 F. App'x 495, 498 (6th Cir. 2017). A mistaken, albeit reasonable, belief that such deference to a provider is warranted will not rise to the level of deliberate indifference. *Id.* Such deference is only unreasonable "in circumstances when the officer is aware of additional information concerning an incarcerated person's condition, or if the medical professional rendered their opinion prior to changed circumstances." *Grote*,

25

85 F.4th at 412. Ms. Moore has not shown that Sergeant Rouse's reliance on Nurse Remines or his following of her instructions was unreasonable under the circumstances.

Officer Jenkins. When Mr. White arrived at the Jail on October 4, Officer Jenkins assisted with the booking process and was aware of his disclosure of stomach problems. (ECF No. 105-2, PAGEID # 683, 690–93; ECF No. 105-10, PAGEID # 762–63.) Officer Jenkins's next interaction with Mr. White was when he observed Mr. White from approximately 2:38 to 5:00 AM on October 9, noting that Mr. White was sitting or resting during each check. (ECF No. 105-2, PAGEID # 685.) When Officer Jenkins learned of Mr. White's spreading pain and trouble urinating, he called Nurse Remines for further instructions. (ECF No. 105-11, PAGEID # 767; Jenkins Dep., 37:15-24; ECF No. 105-7, PAGEID # 715.) He followed those instructions by giving Mr. White a cup of water, but he did not make sure Mr. White drank the water. (ECF No. 105-12, PAGEID # 770; Jewell Aff., ¶ 9.)

Construing the facts in the light most favorable to Ms. Moore, the Court will assume that Nurse Remines instructed Officer Jenkins to arrange for Mr. White's transport to the hospital if his symptoms worsened. (Remines Dep., 62:19-23, 70:20-24, 121:2-6; ECF No. 105-7, PAGEID # 713.) The Court will also assume that Officer Jenkins did not tell Nurse Remines about Mr. White's trouble urinating. Even with these assumptions, Ms. Moore has not shown deliberate indifference on the part of Officer Jenkins—instead, he monitored Mr. White for several hours, affirmatively called Nurse Remines after hearing Mr. White's complaints about new and

26

worsening pain, and followed her instructions by giving Mr. White water. (ECF No. 105-12, PAGEID # 770; ECF No. 105-11, PAGEID # 767.) There is no evidence that Officer Jenkins was aware that Mr. White's symptoms worsened after he spoke with Nurse Remines. Although Officer Jenkins knew about Mr. White's history of ulcers, he did not know the full extent of Mr. White's stomach problems because Mr. White did not disclose them. It was thus reasonable for Officer Jenkins to follow Nurse Remines's instruction. *See McGaw*, 715 F. App'x at 498–99 ("Where, as here, an officer responds to a substantial risk of serious harm by asking for and following the advice of a professional [that] the officer believes to be capable of assessing and addressing that risk, then the officer commits no act of deliberate indifference in adhering to that advice.").[11]

Officer Angel. When Officer Angel completed observatory checks on Mr. White the morning of October 9, she found him sitting in the cell, but he would "jump up and stand in the doorway" upon seeing her in the booking area, which she understood to mean he was not "in much pain." (ECF No. 105-2, PAGEID

---

[11] Ms. Moore argues that Officer Jenkins, along with the other Jackson County Defendants, did not "administer" any "actual treatment" to Mr. White in this case because "[m]erely looking in the cell to see if he is alive and handing him a cup of water is not treatment." (Resp., PAGEID # 1103.) But, as explained, the officers in this case attended to Mr. White, placed him under medical observation, consulted with the nurse multiple times about his condition, and followed her medical guidance. "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976); *see Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011) (citing *Westlake* with approval).

# 685; Angel Dep., 15:14–16:16.) When she asked about his condition, Mr. White

pointed to his stomach but did not verbally tell Officer Angel that anything was

wrong. (*Id.*, 14:19–16:1, 34:4–37:2; ECF No. 105-3, PAGEID # 701.) She later found

Mr. White unresponsive, at which time she began CPR procedures and called for

assistance. (Angel Dep., 25:3–26:10.)

Officer Angel did not know Mr. White's medical history—she knew only

that Jail officials were following Nurse Remines's instructions and that a nurse

would be in to see Mr. White later that day. (ECF No. 105-3, PAGEID # 701.) She

did not find Mr. White's behavior unusual but likened it to that of individuals

going through drug or alcohol withdrawal, which she saw often in the Jail. (Angel

Dep., 16:21–17:2.) Her mistaken belief does not amount to deliberate indifference

unless it was "clearly inconsistent" with the detainee's symptoms, and there is no

evidence of that. *Britt v. Hamilton Cnty.*, No. 21-3424, 2022 WL 405847, at *3 (6th

Cir. Feb. 10, 2022). She reported her interaction with Mr. White to her supervisor

and immediately acted upon finding him unresponsive in his cell. There is no

evidence that Officer Angel deliberately or recklessly disregarded Mr. White's

medical needs.

<u>Officers Cook, Bailey, and Davis.</u> These three officers observed Mr. White

overnight. (ECF No. 105-2, PAGEID # 685.) The Observation Cell Record shows

three entries by Officer Cook (5:20–6:08 AM), two entries by Officer Bailey (2:15 AM

and 4:05 AM), and eight entries by Officer Davis (11:15 PM–1:53 AM). (*Id.*) There is

no evidence that any of them knew Mr. White's medical history or why he was being

medically observed. None of these officers saw any physical activity by Mr. White that would indicate a medical issue—for the most part, they saw him resting or sleeping. *See Helphenstine,* 60 F.4th at 321 (internal quotations and citation omitted) (finding that defendants did not observe "vomiting, diarrhea, shaking, sweating, or any other manifestation of illness. Neither had any reason to appreciate the seriousness of [the detainee's] condition"). Even though none of these officers entered the cell or spoke with Mr. White, they followed Jail policy, and Ms. Moore has not shown that these officers disregarded Mr. White's medical condition.

*     *     *

Based on the foregoing, there is no evidence that these remaining Jackson County Defendants deliberately or recklessly disregarded a known or obvious risk to Mr. White's health, and they are entitled to summary judgment on Count I.

### B. Failure to Train or Supervise Claim Against Sheriff Frazier (Count II)

Ms. Moore sued Sheriff Frazier in his official capacity as the Jackson County Sheriff. (Resp., PAGEID # 1104.) This amounts to a suit against Jackson County itself. *Leach v. Shelby County*, 891 F.2d 1241, 1245–46 (6th Cir. 1989). Ms. Moore bases her § 1983 claim against Jackson County on allegations that Mr. White's death was caused by Jail policy or custom.[12] (Resp., PAGEID # 1104–05.)

---

[12] Although her Complaint asserts that Sheriff Frazier (and thus Jackson County) acted with deliberate indifference by "fail[ing] to adequately train and supervise" Jail officials with respect to identifying, preventing, and responding to inmates' medical conditions and emergencies (Am. Compl., ¶ 19), Ms. Moore seems to have abandoned her failure to train claim in favor of supervisory liability for Jail officials' following of improper "customs" and failure to follow Jail policies. (Resp.,

29

Counties may not be held vicariously liable under § 1983 for the actions of their employees or agents.[13] *Monell v. New York City Dep't. of Social Servs.*, 436 U.S. 658, 694 (1978). A local government may be held directly liable under § 1983 only where "an officially executed policy, or the toleration of a custom ... leads to, causes, or results in the deprivation of a constitutionally protected right." *Doe v. Claiborne Cnty.*, 103 F.3d 495, 507 (6th Cir. 1996) (citing *Monell*, 436 U.S. at 690–91); *Wiggins v. DuPont*, No. 1:17-cv-1107, 2018 WL 2372416, at *3 (N.D. Ohio May 24, 2018) ("To prevail in a § 1983 suit against a municipality, a plaintiff must show that the alleged federal right violation occurred because of a municipal policy or custom."). A county's failure to adequately supervise employees may be considered a custom or policy when such failure amounts to deliberate indifference. *Wiggins*, 2018 WL 2372416, at *5; *see also Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 407 (1997) ("A showing of simple or even heightened negligence will not suffice.").

Here, Ms. Moore attacks various Jail "customs," including those allegedly leading officers to "shift the ultimate responsibility on to someone else"; provide minimal if any information from their observations to "either the jail nurse or the jail doctor"; avoid taking "any vital signs of inmates unless specifically directed to

---

PAGEID # 1104–05.)

[13] The Jackson County Defendants argue that the County cannot be held liable because there has been no showing of individual constitutional violations on the part of Jail officials. (Mot., PAGEID # 658.) Although the Sixth Circuit has suggested such a general rule, it "also has advised that these statements should not be read so broadly." *Craddock v. Cnty. of Macomb*, No. 21-CV-12827, 2024 WL 775172, at *7–8 (E.D. Mich. Feb. 26, 2024), *reconsideration denied*, No. 21-CV-12827, 2024 WL 2607302 (E.D. Mich. May 24, 2024) (discussion); *see also Winkler*, 893 F.3d at 900. Accordingly, the Court will proceed with its analysis.

do so"; and "rely on a licensed practical nurse to make all medical decisions, although she was only present at the Jail three days a week." (Resp., PAGEID # 1104–05.) She then lists three official Jail policies that she asserts were not followed, including those requiring that both a medical doctor and a registered nurse provide healthcare services to inmates, that inmates be given "sick call request forms" when having a medical issue, and that in emergency situations, EMS must transport inmates to the hospital. (*Id.*, PAGEID # 1105.)

"Municipal liability attaches only where the policy or practice in question is attributable to the municipality." *D'Ambrosio v. Marino*, 747 F.3d 378, 387 (6th Cir. 2014) (internal quotations and citation omitted). The thrust of Ms. Moore's argument is not that Jail officials were following improper policies but rather that they were *not* following *proper* policies and instead acting on informal "customs." Putting aside the conclusory nature of these allegations, nothing indicates that the conduct "was acquiesced to or informed by" County actors. *D'Ambrosio*, 747 F.3d at 387; *Winkler*, 893 F.3d at 902. Even construing Ms. Moore's argument to be that Jackson County had a custom of "inaction" in the face of unconstitutional conduct by Jail officials, the argument still fails—there is no record of the Jail "providing constitutionally inadequate medical care to inmates in the past," and Ms. Moore has not alleged the "clear and persistent" office-wide pattern of unconstitutional conduct necessary to support this claim. *Winkler*, 893 F.3d at 902; *see also Thomas v. City of Chattanooga*, 398 F.3d 426, 433 (6th Cir. 2005) (observing that a plaintiff "cannot rely solely on a single instance" to prove existence of unconstitutional custom).

31

Thus, Ms. Moore has not presented facts from which a jury could find that Jackson County had a policy or custom that caused a violation of Mr. White's constitutional right to adequate medical care. Jackson County is entitled to summary judgment on her failure to train or supervise claim.

### C. State-Law Tort Claims Against Jackson County Defendants (Counts IV and VI)

Finally, Ms. Moore brings wrongful death and survival claims against the Jackson County Defendants. (Am. Compl. ¶¶ 30–33.) But, like her federal claims, her state-law claims cannot succeed.

### 1. Wrongful Death Claim

Ohio Rev. Code § 2125.01 establishes a claim for wrongful death, stating that "[w]hen the death of a person is caused by wrongful act, neglect, or default which would have entitled the party injured to maintain an action and recover damages if death had not ensued, the person who would have been liable if death had not ensued … shall be liable to an action for damages." *Id.* In evaluating such a claim, the trier of fact may award damages for "the injury and loss resulting to the beneficiaries … by reason of the wrongful death." *Peters v. Columbus Steel Castings Co.*, 873 N.E.2d 1258, 1261 (Ohio 2007) (quoting Ohio Rev. Code § 2125.02(A)(2)).

Ohio Rev. Code § 2744.03(A)(6) provides that the Jackson County Defendants, as employees of a political subdivision, are immune from wrongful death liability unless their acts were (a) "manifestly outside the scope of the employee's employment or official responsibilities"; or (b) "were with malicious purpose, in bad faith, or in a wanton or reckless manner[.]" *Id.* Because the Jackson

County Defendants' actions were within the scope of their employment with the Jail, the second exception is the only possibility. Ms. Moore argues that the Jackson County Defendants acted in a reckless manner. (Resp., PAGEID # 1106.)

Reckless conduct under Ohio law is "characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Anderson v. City of Massillon*, 983 N.E.2d 266, 273 (Ohio 2012). Considering this standard, Ms. Moore's wrongful death claim against the Jackson County Defendants fails for the same reasons that her deliberate indifference claim fails. *See, e.g.*, *Ewolski v. City of Brunswick*, 287 F.3d 492, 497 (6th Cir. 2002) (granting immunity under Ohio Rev. Code § 2744.03(A)(6)(b) based on earlier finding that officers had not acted with deliberate indifference).

### 2. Survival Claim

A survival claim allows the decedent's estate to recover for any injuries suffered by the decedent before his death. Ohio Rev. Code § 2305.21; *see also Peters*, 873 N.E.2d at 1261 (emphasis in original) ("Thus, when an individual is killed by the wrongful act of another, the personal representative of the decedent's estate may bring a survival action *for the decedent's own injuries* leading to his or her death as well as a wrongful-death action *for the injuries suffered by the beneficiaries of the decedent* as a result of the death."). However, "[s]urvivorship is a claim that is derivative of the principal claims in a complaint," such that it remains only "so long as any of the underlying principal [sic] claims in the complaint remain." *Stratford v.*

33

*SmithKline Beecham Corp.*, No. 2:07-cv-639, 2008 WL 2491965, at \*9 (S.D. Ohio June 17, 2008) (Graham, J.) (citation omitted). Because the Court is granting summary judgment to the Jackson County Defendants on all other claims, Ms. Moore's survivorship claim fails as well.

## V. CONCLUSION

There is no doubt that the facts of this case are tragic. A man lost his life while in Jackson County's custody and, had his condition been diagnosed in time, he may have survived. However, Ms. Moore has not shown that the actions of the Jackson County Defendants rose to the level of a constitutional or state-law violation. For the reasons set forth above, the Jackson County Defendants' Motion for Summary Judgment (ECF No. 105) is **GRANTED**.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**

34